# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BARBARA S. WARREN,        )
                           )
          Plaintiff,     )
                           )
      v.                )          Civil Action No. 14-1094 (BAH)
                           )
JEFF T.H. PON, Director,     )
Office of Personnel Management,[1]  )
                           )
         Defendant.   )

## <u>MEMORANDUM OPINION</u>

Plaintiff Barbara S. Warren brings this action under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), *see* 42 U.S.C. §§ 2000e *et seq*., and the Age Discrimination in Employment Act ("ADEA"), *see* 29 U.S.C. §§ 621 *et seq*., against her former employer, the Director of the Office of Personnel Management ("OPM"). Pending before the Court is Defendant's Motion for Summary Judgment, ECF No. 36. For the reasons discussed below, OPM's motion will be granted.

## I. BACKGROUND

The plaintiff, who was born in 1949, Compl. ¶ 13, describes herself as "an African American woman of medium-brown color," *id.* ¶ 14; *see* Def.'s Mem. in Support of Mot. for Summ. J. ("Def.'s Mem."), Ex. 1 ("Pl.'s Dep.") at 11:23-12:7. On August 6, 2007, the plaintiff was hired under the Federal Career Intern Program, with her appointment "not to exceed [two] years." Def.'s Mem., Ex. 3 (Notification of Personnel Action dated August 6, 2007). "Upon satisfactory completion of the program, [the plaintiff could have been] noncompetitively

---

[1] The current OPM Director is substituted as the defendant in this case. *See* Fed. R. Civ. P. 25(d).

converted to a permanent appointment." *Id.* If, however, her performance was "not satisfactory or if [she] fail[ed] to satisfactorily complete this program, employment [was to] be terminated." *Id.*

The plaintiff worked in OPM's Federal Investigative Services Division ("FISD"), now known as the National Background Investigations Bureau, Def.'s Mem. at 2, as a Special Agent (Investigator), GS-09, step 01, *see id.*, Ex. 3; *see also id.*, Ex. 1 ("Pl.'s Dep.") at 23:13-18. From August 6, 2007 through February 18, 2008, the plaintiff's immediate supervisor, or Supervisory Agent in Charge ("SAC"), was Dave Ferguson, *see* Pl.'s Dep. at 26:12-20, who led a team of approximately twenty Investigators, Pl.'s Dep. at 26:16-18. The plaintiff then transferred to another team, Pl.'s Dep. at 28:15-16, and from February 19, 2008 through November 2008, the SAC was Erin Leigh Briggs ("Briggs"), Pl.'s Dep. at 28:9-16, whose team included eight first-year agents, Pl.'s Dep. at 30:19-31:1. The plaintiff's second-level supervisor was Vicki Clancy ("Clancy"), Deputy Chief of Field Operations for the Capital Region. Def.'s Mem., Ex. 6 ("First Clancy Aff.") at 1. Her third-level supervisor was Barry Shine ("Shine"), Program Manager, Chief of Field Operations for the Capital Region, *id.*, Ex. 18 ("First Shine Decl.") at 1-2; *id.*, Ex. 2 ("Warren Aff.") at 2. Her fourth-level supervisor was Charles F. Dininger ("Dininger"), Chief of Field Operations. Warren Aff. at 2. Initially, the plaintiff's duty station was in Annandale, Virginia; as of August 25, 2008, her duty station was in Arlington, Virginia. *Id.*

An Investigator (Special Agent), under a SAC's supervision, "conducts and reports investigations primarily involving Federal personnel operations." Def.'s Mem., Ex. 4 (Position Description) at 2. The Investigator "characteristically performs the full range of investigative functions on assigned cases or portions of cases, from planning through fact-finding to reporting the results of [her] investigations." *Id.*, Ex. 4 at 2. "The supervisor reviews the work completed

by the GS-9 investigator for technical accuracy and adequacy and for compliance with operating instructions, guides, rules and regulations." *Id.*, Ex. 4 at 4. The position "is a national security position, designated as critical-sensitive." *Id.*, Ex. 4 (Addendum to Position Description) at 6.

"[The plaintiff] graduated from the Basic Investigator Course (BIC) on October 19, 2007." Def.'s Mem., Ex. 10 ("Second Briggs Aff.") at 3. She "work[ed] in the field from October 19, 2007 to January 15, 2008," and as of January 15, 2008, or 90 days after graduation from the BIC, the plaintiff was "placed on standards," Second Briggs Aff. at 3; *see* First Clancy Aff. at 4, which presumably refers to the performance standards applied to first-year agents, *see* Def.'s Mem., Ex. 12 (First Year Special Agent Performance Standards), ECF No. 36-12.

### A. Telephone and Email Communications and Meetings with Briggs

The plaintiff apparently found fault with Briggs' management and communication style. She objected to Briggs' "overall demeanor and the way [Briggs] handled conversations" with her. Pl.'s Dep. at 38:15-16. While the plaintiff had "[n]o issue" accepting criticism from her former supervisor Dave Ferguson, Pl.'s Dep. at 33:10, she believed that the criticism she received from Briggs offered "[n]othing constructive," Pl.'s Dep. at 33:19. According to the plaintiff, Briggs "deliberately and spitefully harassed [her] by subjecting [her] to [an] idiosyncratic style of micromanagement," for example, by giving "[her] work . . . a level of scrutiny that was unnecessary and unproductive." Warren Aff. at 2. The plaintiff considered Briggs "bossy [and] dictatorial," and accused Briggs of having "devised a system of communication that set [the plaintiff] apart from [her] coworkers for special demeaning treatment." *Id.* For example, the plaintiff discerned a distinction between the types of emails Briggs would send. *See* Pl.'s Dep. at 55:12-19, 56:17-23. Group 1 emails, which "tend[ed] to have a positive message," were "addressed to recipients in alphabetical order according to the

3

last names," and Group 2 emails, which "tend[ed] to be negative," listed the plaintiff as the first recipient. Warren Aff. at 4 (emphasis removed); *see id.* at 4-6, 11-12, 17; *see also* Def.'s Mem., Ex. 17 (Report of Investigation, Appendix A (Comparative Analysis of Type 1 (Positive) and Type 2 (Negative) Combined Emails (February 3 – September 29, 2008)). According to the plaintiff, Briggs would "not return calls or respond to emails in a timely manner," which had a negative impact on the plaintiff's "case work performance" and caused her "to turn elsewhere for information or direction." Warren Aff. at 12.

On March 18, 2008, the plaintiff received an email from Briggs, who had randomly reviewed a case assigned to the plaintiff. *Id.* at 6. In the email, Briggs stated that the plaintiff "had not made an attempt to contact the Subject of the [investigation] for leads and no case message regarding leads had been sent to the investigator who would be doing the Subject interview." *Id.* Briggs allegedly told the plaintiff that "items were still pending" and issued instructions that the plaintiff "call the help desk to [have] them . . . re-open the case and . . . call the Subject for leads." *Id.* The plaintiff did follow up, *see id.* at 6-7, yet days later Briggs "continued to badger" her regarding the case," *id.* at 7, during a telephone call on or about March 24, 2008, *id*; *see* Pl.'s Dep. at 33:20-34:16. The plaintiff "ended the conversation," after having advised Briggs that she "was not going to put up with [Briggs'] actions." Warren Aff. at 7.

Just over a month after joining Briggs' team, the plaintiff approached her second- and third-level supervisors regarding her problems with Briggs, including Briggs' "condescending manner and unprofessionalism." *Id.* at 13. On March 27, 2008, the plaintiff met with Shine and Clancy, for a meeting that lasted several hours. Def.'s Mem., Ex. 9 ("First Briggs Aff.") at 4; First Shine Aff. at 2; First Clancy Aff. at 2; Warren Aff. at 14. Briggs joined the meeting during its last hour, and at its conclusion, Shine was under the impression "that all issues between [the

plaintiff] and [Briggs] had been discussed and resolved to the extent that they agreed to start over." First Shine Aff. at 2. Shine opined that the plaintiff believed Briggs was not treating her like an adult, a misunderstanding which he thought could occur "when a supervisor [provides] unwanted constructive criticism." *Id*. After having reviewed 10 emails between the plaintiff and Briggs, Shine found that none was demeaning. *Id*. Rather, in his view, the emails showed that the plaintiff was "upset about her reports being returned to her and felt that she was not being treated as an adult who was able to work independently." *Id*.

According to Clancy, the plaintiff believed that Briggs "was being too picky in her case review," and the plaintiff simply "did not like the way Briggs communicated with her." First Clancy Aff. at 2. The plaintiff "stated that Briggs had a 'tone' in her emails." *Id*. Clancy advised both the plaintiff and Briggs "to simply read their emails and not to 'read into' the emails." *Id*. at 3. According to Clancy, the plaintiff and Briggs left the meeting with an agreement to "begin a new and better supervisor/subordinate relationship." *Id*. The plaintiff "agreed [to] treat Briggs with more respect and Briggs agreed to communicate more clearly what changes needed to be made in reports to improve their quality." *Id*.

The plaintiff requested bereavement leave, from April 14, 2008 through April 16, 2008, after the death of her father on March 24, 2008. Warren Aff. at 7. On April 8, 2008, Briggs called the plaintiff's "cell phone and questioned whether [she] would be able to complete the work assigned [with Assigned Completion Dates] of April 16, 2008." *Id*. The plaintiff was told that, if she could not complete the work timely, Briggs would not approve her leave request. *Id*. Apparently the plaintiff's leave request was approved anyway, as a mid-year review previously scheduled for April 15, 2008, was rescheduled for April 17, 2008. *See id*. at 7-8.

A telephone call from Briggs to the plaintiff on or about April 23, 2008, turned into a heated exchange. *See* Pl.'s Dep. at 36:20-38:1. Briggs left the plaintiff a voicemail message in the afternoon, and gave the plaintiff "a window of ten to fifteen minutes to return the call[.]" Warren Aff. at 8. She returned Briggs' call "within seven or eight minutes," and Briggs interrupted their conversation to take a personal call from her daughter's school on her other phone. *Id*. Briggs had called the plaintiff about "[w]ork on [a] case [which had] not been done correctly, and . . . asked [the plaintiff] several background questions so [she] could ascertain what needed to be done to have the case completed correctly." First Briggs Aff. at 3. Briggs opined that the plaintiff should have visited the subject of the investigation without making an appointment in advance, and that the plaintiff should have inquired into particular matters. Warren Aff. at 9. The plaintiff disagreed, and believed that the subject deserved the courtesy of advance notice. *Id*. at 8-9. Furthermore, the plaintiff considered Briggs' questions "badgering." *Id*. at 9. "[A]t some point [the plaintiff] began to yell her responses through the phone." First Briggs Aff. at 3. According to Briggs, the plaintiff explained "that she felt harassed and browbeaten" because of Briggs' questions, and for this reason, the plaintiff "was yelling." *Id*. Before the conversation ended, the plaintiff told Briggs that she "had had enough [of Briggs'] badgering." Warren Aff. at 9. Briggs then directed the plaintiff to cancel her appointments for the following day and to meet her at the Annandale office on the following morning. *Id*.; First Briggs Aff. at 3.

SAC JoAnn Johnson attended the April 24, 2008 meeting at the plaintiff's request and with Briggs' consent. Def.'s Mem., Ex. 10 ("Johnson Aff.") at 2. Briggs informed Johnson "that [the plaintiff] had been rude to her on the telephone and she wanted to discuss the matter face-to-face." Johnson Aff. at 2. According to Johnson, Briggs and the plaintiff "were in

disagreement" about the handling of an investigation, and both "became upset during [their] conversation" on the previous day. *Id*. at 3. Both Briggs and the plaintiff "raise[d] their voices at each other during their meeting; both calmed down with Johnson's intercession. *Id*. Briggs sometimes would gesture by raising her hands to signify "STOP . . . as if she [were] speaking to a child, when she did not want to hear with [the plaintiff] was saying." *Id*.; *see* Warren Aff. at 10. Nevertheless, the meeting appeared to have ended cordially. *See* Johnson Aff. at 3.

The plaintiff also made her issues with Briggs known to her fourth-level supervisor. On May 5, 2008, she met with Dininger, Warren Decl. at 15, and shared with him four emails from Briggs. Def.'s Mem., Ex. 15 ("First Dininger Aff.") at 2. Based on his review, none of these emails "appear[ed] to be demeaning." *Id*. She also discussed her concern that Briggs "was being disrespectful and unprofessional to her in conversations," in part, because Briggs "was raising her voice." *Id*. at 3. The plaintiff explained that she behaved "according to the way she was treated by others," suggesting that, if Briggs raised her voice, the plaintiff would raise her voice in return. *Id*. Dininger observed that "there are two very strong personalities involved" here, and the plaintiff believed herself "experienced in the field and did not appreciate . . . feedback from . . . Briggs." *Id*. at 4.

Apparently the relationship between the plaintiff and Briggs did not really improve. Beginning in May 2008, Briggs arranged to have a third party present at weekly meetings with the plaintiff "due to the often hostile, rude and confrontational behavior of the [plaintiff]." First Clancy Decl. at 4. Clancy sat in on two of their meetings in August and September 2008, *id*. at 3-4, and based on her observations, the plaintiff "conducted herself professionally" but "seem[ed] to be easily agitated and look[ed] for reasons to disagree with or criticize [Briggs]." *Id*. at 3. According to Johnson, Briggs discussed the problems she was having with plaintiff with

other SACs, such that the plaintiff "became the butt of the SACs' jokes[.]" Johnson Aff. at 4. When the plaintiff learned of this, she attributed Briggs' comments to her inability to transfer to another team as she had requested. Pl.'s Dep. at 62:16-24.

**B. April 17, 2008 Mid-Year Review**

The plaintiff's mid-year review should have taken place on April 17, 2008, Compl. ¶ 21, yet according to the plaintiff, it did not occur, Pl.'s Dep. at 38:19-24. She does concede that she had a formal meeting with Briggs for a review on April 17, 2008, *see* Warren Aff. at 13, but the plaintiff "was not given a rating of record" at that time for the following reason:

> [The plaintiff] graduated from the Basic Investigator Course (BIC) on October 19, 2007. She was placed on standards 90 days after her graduation from the BIC (January 15, 2008). [She] did work in the field from October 19, 2007 to January 15, 2008, not under standards [because all agents are granted] 90 days from graduation to work not under standards. [The plaintiff] was placed on standards January 15, 2008, and had to be on standards 90 more days before she could be rated. This is why she was not given a rating of record at the mid-year review.

Def.'s Mem., Ex. 10 ("Second Briggs Aff.") at 3; *see* Pl.'s Dep. at 38:21-24; First Clancy Aff. at 4. In other words, at the time of the mid-year review, the plaintiff had been working to standards fewer than 90 days, too short a period to receive a performance rating.

Briggs began "by [remarking] that [the plaintiff] was a first-year agent [who] had not been treated as a new agent." Warren Aff. at 13. Rather, Briggs stated, the plaintiff "had been given complex and counter intelligence cases that were above the level of [cases the plaintiff's] peers were working." *Id*. Briggs also remarked that "there was new agent training [the plaintiff] had not had. *Id*. at 14. Although the plaintiff alleges that she had not been provided "the training she should have received as a first-year agent," Compl. ¶ 20, elsewhere the plaintiff stated that Briggs arranged for training in May 2008, Warren Aff. at 14. Briggs stated that the plaintiff

"was provided training on May 5, 2008 on Case Coverage," enrolled in a Report Writing Workshop on July 25, 2008, and was provided training "at a team meeting on June 18, 2008 on Financial Coverage, Foreign Travel/Foreign Contact Coverage and Mental Health Coverage." First Briggs Aff. at 3-4; *see* Def.'s Mem., Ex. 12 at 9. At this meeting, Briggs briefly mentioned timeliness and quality of case work. Warren Aff. at 4.

According to the plaintiff, "[a]t no time between February 26, 2008 and August 15, 2008 did . . . Briggs sit down and discuss [her] performance levels with [her]," either during "the required weekly meetings nor . . . when stats came out once a month at team meetings." *Id*. at 16. She claimed that Briggs "never discussed . . . monthly statistics which would [have] include[d] quality, timeliness, production and overall competencies." *Id*. Not until September 4, 2008 did the plaintiff receive performance statistics from Briggs, and these covered the period from January 2008 through August 2008. *Id*.

### C. Hold Report Status

According to Clancy, "[i]t became evident to Briggs after conducting case review of reports of investigation that the [plaintiff] did not fully understand the requirements of [her] position and needed to be more closely supervised and trained[.]" First Clancy Aff. at 3-4. During the April 17, 2008 meeting, Briggs informed the plaintiff that she had been placed on "hold report" status for a 30-day period beginning on April 21, 2008. Warren Aff. at 13. Clancy described "Hold Report" as "a function of the operating system which allows an investigator to transmit a report and the supervisor to review the report before releasing it[.]" First Clancy Aff. at 4; Warren Aff. at 3.

According to Briggs, hold report status is positive: it is an opportunity to look for errors and "give [agents] tips on how to improve." Def.'s Mem., Ex. 5 ("Briggs Dep.") at 32:14. New

agents may be put on hold report status "so that all of their casework is looked at to be sure [it is] complet[ed] correctly, [without] spelling errors [or] grammar errors, [and to ensure that] coverage is complete." *Id*. at 45:18-21. She acknowledged that some "[p]eople look at it negatively." *Id*. at 32:10. Agents whose reports are "deficient . . . can be put on hold report" status. *Id*. at 45:22-46:1.

Briggs placed the plaintiff on hold report status because she was a first-year agent who "was new to [Briggs'] team." First Briggs Aff. at 3; *see* Warren Aff. at 13. All first-year members of Briggs' team had been placed on hold report status while under Briggs' supervision, Pl.'s Dep. at 31:2-6, and all had been required to meet weekly or semi-weekly with Briggs, Pl.'s Dep. at 31:7-9.

Along with hold report status came two additional obligations: the plaintiff was to "complete a Daily Work Report" for submission to Briggs each week, and to attend weekly meeting with Briggs "to discuss [her] case load." Warren Aff. at 13. The weekly meetings were to commence on April 22, 2008 at the Annandale, Virginia office. *Id*. at 11, 13. According to the plaintiff, Briggs frequently cancelled these meetings and did not reschedule them for the same week. *Id*. at 5, 11. Between April 22, 2008 and October 14, 2008, the plaintiff stated that Briggs cancelled 15 out of 25 meetings, often on short notice. *Id*. at 11. Briggs could have, but did not, "attempt to conduct the meeting[s] via telephone." *Id*.

Instead, attendance at these weekly meetings forced her to commute to the office in traffic anywhere from 45 minutes to over one hour.[2] *Id*. The plaintiff believed that time devoted to these meetings prevented her from working on her cases. *See id*. Briggs stated that she

---

[2] Clancy contradicted the plaintiff's assertion that her hold report status caused her "to travel one and a half hours weekly to meet with her supervisor." First Clancy Aff. at 4. Hold report happened electronically and independently from weekly meetings with Briggs at the office. *Id*.

offered to meet at a time more convenient for the plaintiff; the plaintiff declined to propose an alternative. First Briggs Aff. at 3. Briggs noted that the plaintiff was travelling in a government vehicle, and during non-rush hour periods, the drive to the Annandale office should have taken roughly 35 minutes. *Id.* Further, Briggs explained that "time spent travelling to the meetings, discussing case work and returning to her place of origin was deducted from her productive hours." *Id.*; First Clancy Aff. at 4.

Briggs placed the plaintiff on hold report status for a second 30-day period beginning on June 27, 2008, Warren Aff. at 13; *see* Second Briggs Aff. at 6, due to the plaintiff's poor performance, First Briggs Aff. at 3. When the period ended, Briggs still required weekly meetings, but no longer required submission of Daily Work Reports. Warren Aff. at 13.

**D. Check Rides**

Clancy describes "Check Ride" as a tool "to assist, guide and train new employees." First Clancy Aff. at 4. A supervisor or senior investigator rides along with a first-year agent to ensure that the agent plans her day well and conducts her investigations according to standards. *Id.* The senior person would be available to offer "immediate feedback and observation to assist the agent in improving [her] performance." *Id.* An agent normally participates in four check rides in her first year. First Briggs Aff. at 4; Warren Aff. at 16. The SAC schedules check rides at her discretion to take place "at any time during an agent[']s first year." First Briggs Aff. at 4.

When Briggs realized that the plaintiff only had had one check ride, she sent the plaintiff an email on June 3, 2008 about the remaining three. *Id.* at 4. Catherine Fraser, a senior agent, conducted the second and third check rides on June 20, 2008 and August 1, 2008. Warren Aff. at 16-17; First Briggs Aff. at 4. Briggs conducted the fourth check ride on September 24, 2008, Warren Aff. at 17, but the case the plaintiff chose to work on that day did not require the type of

investigation, a Single Scope Background Investigation, Briggs deemed appropriate for a check ride, *id*. at 17-18. Briggs was to assign another type of case to the plaintiff for completion of the check ride on October 3, 2008. *Id*. at 18. As of October 22, 2008, the plaintiff stated, Briggs had not reassigned the case or rescheduled the check ride. *Id*.

Briggs stated that she declined to "complete [the] scheduled check-ride on Sep[tember] 24, 2008 due to [the plaintiff's] unprofessional conduct." Second Briggs Aff. at 4. The plaintiff allegedly "was verbally abusive" to Briggs. *Id*.; Def.'s Mem., Ex. ("Second Clancy Aff.") at 4. This incomplete check ride was not factored into the plaintiff's FY 2008 performance evaluation. Second Briggs Aff. at 4; Second Clancy Aff. at 4.

### E. Denial of Within-Grade Increase and Promotion

The plaintiff would have been eligible for a within grade increase and a promotion, but only insofar as she served in her position for the requisite length of time. Second Clancy Aff. at 3. On or about August 8, 2008, the plaintiff was denied a within grade increase, from step 01 to step 02, "because [her] work [was] not at an acceptable level of competence." Def.'s Mem., Ex. 8 (Notification of Personnel Action dated August 17, 2008). The plaintiff "was not performing at the minimally successful level, because she was unsuccessful in three of the four critical elements of her performance standards." Second Clancy Aff. at 3; *see* Second Briggs Aff. at 3. Similarly, because the plaintiff "was not performing at the fully successful level," she "was not eligible for promotion." Second Briggs Aff. at 3; *see* Second Clancy Aff. at 3. Nor did the plaintiff "possess the skills necessary to perform at the next grade level and therefore the promotion was denied." Second Clancy Aff. at 3.

**F. The Plaintiff's Performance**

"Whenever an employee is failing in the quality rating and may receive an unsuccessful rating or within grade or promotion denial based on quality, . . . the supervisor send[s] cases to the Quality Management Group . . . for an independent assessment of quality." Second Clancy Aff. at 4. The purpose was "to ensure that the supervisor [rates] the reports correctly and that the case work is truly unsatisfactory for purposes of performance ratings." *Id.*; Second Briggs Aff. at 5. An independent quality review of twenty Report of Investigation ("ROIs") prepared by the plaintiff in July 2008 revealed that half required some form of correction: eight (40%) were deficient, and two (10%) were adequate with corrections. Def.'s Mem., Ex. 21 (Letter to Briggs from Randal DeMichiei, Program Manager, FISD QMG, dated September 2, 2008).

The plaintiff's FY 2008 Performance Appraisal took into account work the plaintiff completed while under standards, from January 22, 2008 to September 30, 2008. *Id.*, Ex. 12 (Performance Summary) at 9. This appraisal did not factor in the plaintiff's incomplete fourth check ride, Second Briggs Aff. at 4; Second Clancy Aff. at 4, and noted that the plaintiff's three completed check rides were rated "Acceptable," Def.'s Mem., Ex. 12 at 9. OPM based the appraisal on "[a]pproximately 70 cases completed by [the plaintiff that had been] reviewed and evaluated for the purpose of identifying her knowledge, skills, and abilities in the element." *Id.* Two of the plaintiff's cases "referred by reviewers and her SAC" received a "deficient" rating, and seven cases received an "adequate with corrections" rating during the rating period. *Id.*; *see* Second Briggs Aff. at 2. The appraisal mentioned the results of the Quality Management Group study, which rated eight cases "deficient," and two "adequate with corrections," resulting in a total number of ten "deficient" cases and nine "adequate with corrections" cases. Def.'s Mem., Ex. 12 at 10. As a result, the plaintiff was rated "'Unacceptable' in the area of Quality." Second

Briggs Aff. at 2. Her quality rating was 94.08%, and a minimally successful rating would have required a quality rating of 96%. *Id.*

In the timeliness, productivity and competency areas, the plaintiff was rated "minimally successful." Def.'s Mem., Ex. 12 at 9-10. With regard to timeliness, the plaintiff "consistently missed" deadlines, which managers "in part attributed to the time it takes her to start a case upon assignment." *Id.* at 9. It was noted that, "in April 2008 the complexity of her work was decreased to facilitate increased production [to] allow her to focus ono the quality of her investigative product." *Id.* at 10. While the plaintiff "had no security violations," her "low quality score" suggested "that she does not have the appropriate knowledge and understanding of the technical requirements of the job to be rated Fully Successful" in the competency area. *Id.* Overall, the plaintiff's "cumulative rating for the period of October 1, 2007 to Sep[tember] 30, 2008 [was] Unacceptable." *Id.*; *see id.*, Ex. 12 (Performance Appraisal) at 1.

The performance standards applicable to first-year agents were to apply to the plaintiff through the end of FY 2009. Second Briggs Aff. at 4. Briggs explained that a first-year agent "must perform under [first] year standards for an entire calendar year," and that FISD "only transitions agents to professional standards" at the beginning of a fiscal year, the first day of October. *Id.* Because the plaintiff had been placed under first-year standards on January 15, 2008, she had not been performing under first-year standards for a full year when the next fiscal year began on October 1, 2008. *Id.* Although she would have been performing under first-year standards for a full calendar year as of January 15, 2009, "her transition to professional standards would not have occurred until Oct[ober] 01, 2009." *Id.*

Clancy stated that each supervisor provided Individual Data Production Reports early each month to each subordinate in his or her "drop file[]." First Clancy Aff. at 4. The report

"outline[d] how the employee [was performing] in terms of two of the four critical elements in [the] performance standards, timeliness and productivity." *Id.* According to Clancy, "[e]very month from April 2008 forward, the [plaintiff] was provided with her Individual Production Data Report highlighted by Briggs so she could she where she was performing against her standards." *Id.* According to the plaintiff, she received a "Comparative Analysis of frequency of Individual Data Production Reports" for "the first time . . . all year" on September 4, 2008 covering the period from January 2008 through August 2008. Mem. in Support of Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 7, ECF No. 40-1; *see* Warren Aff. at 16. She denied that there had been any discussion of her performance levels or "monthly statistics, which would include quality, timeliness, and overall competencies." Warren Aff. at 16. Nor, she claimed, had Briggs "provided any guidance" as to her deficiencies." *Id.*

Clancy explained that each "employee is responsible for knowing what is expected of [her] and knowing whether or not [she is] performing at an acceptable level." Second Clancy Aff. at 5. Statistical goals were set forth in the plaintiff's performance standards, and it was considered "an advantage to work[] with such metrics-based expectations." *Id.*

### G. Termination

OPM terminated the plaintiff's employment, effective November 28, 2008, due to "unacceptable performance and misconduct." Def.'s Mem., Ex. 13 (Memorandum dated Nov. 26, 2008) (emphasis removed); *see id.*, Ex. 14 (Notification of Personnel Action dated November 28, 2008). Clancy explained that "the decision . . . was due to poor quality . . . , one of the critical elements in her performance standards." Second Clancy Aff. at 2. Further, Clancy noted that the plaintiff "did not appear to be learning from her mistakes and did not demonstrate the skill level necessary to conduct the work at a successful level." *Id.*

Briggs concurred, explaining that the plaintiff "was terminated due to unacceptable performance."  Second Briggs Aff. at 2.  By "misconduct," Briggs meant that the plaintiff "was verbally abusive to [her] via phone on three separate occasions, verbally in person at least once and sent rude and unprofessional emails to [her] on at least 3 occasions."  *Id*.

### H. The Plaintiff's EEO Activity

The plaintiff "initiated contact with [OPM's] Equal Employment Opportunity (EEO) Office" on May 28, 2008, August 31, 2008, and November 28, 2008," and the EEO Office "received formal complaints from [the plaintiff] on August 27, 2008, November 8, 2008 and December 24, 2008."  Compl., Ex. (Final Agency Decision ("FAD")) at 1.  The EEO Office "consolidated all three cases . . . for investigation."  *Id*., FAD at 2.  Generally, the plaintiff alleged discrimination based on her race (African-American), color (medium brown) and age (born in 1949), and alleged she had been subjected to a hostile work environment, *see id*. (Issues Accepted Under Case No. 200830), and alleged retaliation for prior EEO activity, *see id*. at 3, 4 (Issues Accepted Under Case Nos. 200902 and 200908).  Ultimately, on review of the record, it was determined that the "plaintiff failed to prove [that OPM] discriminated against her based on age, race or reprisal," or that she was subjected to "a hostile work environment or illegal harassment."  *Id*. at 23.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court appropriately grants summary judgment against a party who, "after adequate time for discovery and upon motion, . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986). The movant bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *id*. at 323, while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in her favor, *see Anderson v. Liberty Lobby, Inc*. ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'") (quoting *Liberty Lobby*, 477 U.S. at 248); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment.") (internal quotation marks omitted); Fed. R. Civ. P. 56(c), (e)(2)-(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth*., 651 F.3d 118, 123 (D.C. Cir. 2011). This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, __ U.S. __, 134 S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id*. at 1863 (quoting *Liberty Lobby*, 477 U.S. at 255). Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (internal quotation marks omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

For a factual dispute to be "genuine," however, the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [her] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (internal quotation marks omitted); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *accord* Fed. R. Civ. P. 56(e). If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. DISCUSSION

In response to plaintiff's claims, under Title VII and the ADEA, that OPM engaged in unlawful employment discrimination and harassment based on the plaintiff's age, race, color, and in retaliation for her prior protected activity of filing discrimination complaints, by denying her a within-grade salary increase and a promotion and terminating her employment, the defendant contends that "OPM has set forth legitimate, nondiscriminatory reasons for its employment actions, such that [the plaintiff] cannot prove to a reasonable jury that such actions were motivated by discriminatory or retaliatory animus towards her," and, in any event, the plaintiff has failed to "present adverse employment actions" that are "severe or pervasive enough to alter the conditions of her employment." Def.'s Mem. at 1. These arguments are discussed below.

**A. OPM's Legitimate Nondiscriminatory Reasons for Adverse Employment Actions**

It is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race [or] color[,]" 42 U.S.C. § 2000e-2(a), or because of her age, 29 U.S.C. § 623(a)(1).  Where, as in this case, there is no direct evidence of discrimination, the court turns to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *See, e.g., Mayorga v. Ayers*, No. 15-cv-1604, 2017 U.S. Dist. LEXIS 201636, *24 (D.D.C. Dec. 7, 2017).  "To establish a prima facie case of discrimination, [the plaintiff] must show that '(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).  The plaintiff's success in "[e]stablish[ing] a prima facie case triggers the employer's burden to produce admissible evidence that, if believed, would establish that [its] action was motivated by a legitimate, nondiscriminatory reason." *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004) (citation omitted).  This is a burden of production, not persuasion.  *Id.* (citation omitted).

Once the employer "has succeeded in carrying its burden of production, the *McDonnell Douglas* framework – with its presumptions and burdens – is no longer relevant." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993).  Rather, "the trier of fact proceeds to decide the ultimate question," *id.* at 511, whether the plaintiff has produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, [or age,]" *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir.

2008). "[S]ufficient evidence may include, *inter alia*, (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).'" *Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012) (internal quotation marks and citations omitted).

Under both Title VII and the ADEA, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the [her] race, color [or] age[.]" *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (citations omitted). The parties do not dispute that the plaintiff is an African-American female over 40 years of age who was denied a within-grade increase, denied a promotion, and terminated. Remaining for resolution, then, is the question whether the plaintiff suffered these adverse employment actions or was subjected to a hostile work environment because of her race, color, or age, or in retaliation for having engaged in protected EEO activity.

### 1. Denial of Within Grade Increase and Promotion

Applicable personnel regulations provide that only an employee whose performance is acceptable for the most recent rating period is eligible to receive a within grade increase. *See* 5 C.F.R. § 531.404(a); *see also* Def.'s Mem., Ex. 22 (Human Resources Handbook, Chapter 430, Sec. 5-2). According to OPM, the plaintiff's unacceptable performance was the reason for the denial of a within grade increase, from step 01 to step 02. *See* Def.'s Mem. at 12; *see id.*, Ex. 16 ("Second Dininger Aff.") at 2; Second Briggs Aff. at 3; Second Clancy Aff. at 3. OPM supports its position by pointing to the plaintiff's FY 2008 performance appraisal which found the rate of deficiencies to be below that required for a minimally successful rating, and to the Quality

Management Group's independent review of 20 cases the plaintiff completed in July 2008, half of which were deficient in some way. *See* Def.'s Mem. at 12-13. Similarly, OPM asserts that the plaintiff was "not eligible for a promotion because she was not performing at the fully successful level, as reflected in her . . . performance rating." *Id*. at 13; *see id*., Ex. 22 (Human Resources Handbook, Chapter 430, Sec. 5-5(a)). OPM relies, too, on Clancy's conclusion that the plaintiff "did not possess the skills necessary to perform at the next grade level and therefore the promotion was denied." Second Clancy Aff. at 2. Lastly, OPM asserts that the denial of a promotion "is fully consistent with the OPM Human Resources Handbook. Def.'s Mem. at 13; *see id*., Ex. 22.

The plaintiff counters that, "in relation to [her] comparators, . . . Briggs took every opportunity to deny [her] an equal opportunity to perform to the best of her abilities resulting in unfair adverse employment actions." Pl.'s Opp'n at 9. For example, the plaintiff claims not to have known of her unacceptable performance until August 17, 2008, the date on which she was denied the promotion and within grade increase. *See id*. at 9-10. She claims to have been the only first-year agent placed on hold report status, required to meet with Briggs weekly, and required to submit daily work reports each week while on hold report status. *Id*. at 10. In addition, the plaintiff asserts, Briggs withheld statistics from her, thus depriving her of an opportunity to "get an accurate assessment of [her] performance." *Id*. Briggs also allegedly "delayed [the plaintiff's] final check ride until six days before the fiscal year ended which effectively denied her sufficient time to improve her performance." *Id*. at 11. These purported acts of "sabotage," the plaintiff contends, "clearly establish[] that at no point did . . . Briggs seek to give [her] the tools to perform at or above a minimally acceptable" level. *Id*. Based on these

assertions, the plaintiff concludes that the defendant did not have a legitimate nondiscriminatory reason for denying her within grade increase or promotion. *Id.*

Curiously absent from the plaintiff's opposition is any suggestion that OPM's decisions to deny a within grade increase and a promotion are in any way linked to the plaintiff's race, color or age. Nor does she identify any action taken by OPM with knowledge of or in retaliation for the plaintiff's protected EEO activity. Furthermore, the plaintiff mentions "comparators" in her opposition, *see* Pl.'s Opp'n at 9, without identifying them or proffering any evidence that any similarly situated investigator of another race, color or age received more favorable treatment than the plaintiff received. She does not demonstrate that any other employee whose employment situation was "nearly identical" to hers in "all . . . relevant aspects," had been "charged with offenses of comparable seriousness." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 290, 301 (D.C. Cir. 2015) (internal quotation marks and citation omitted). Rather, according to OPM, the plaintiff was the only investigator in the office whose performance was rated unacceptable. *See* Def.'s Mem., Ex. 17 (Report of Investigation, Appendix K, National Capital Area FISD Employees, FY 2008 Investigator Ratings – Field Office #8).

In the absence of any proffer of evidence from the plaintiff, this Court can only concur with the defendant's assessment that, "[b]oiled down to its essence, [the p]laintiff has nothing more than her sheer speculation that [OPM's] employment actions had anything to do with her race, color, or age or retaliation." Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 3, ECF No. 41. There is no evidence from which a jury could conclude that OPM discriminated against the plaintiff on the basis of her race, color or age, or in retaliation for protected EEO activity when it denied a within grade increase and a promotion. Without any such evidence her Title VII and ADEA claims fail.

The plaintiff cannot salvage her claims by pointing to a purported inconsistency in the evaluation of her performance by two different SACs, Ferguson and Briggs. *See* Pl.'s Opp'n at 12-13. Even if the plaintiff's relationship with Ferguson had been free of conflict, *see id*. at 12, the mere fact that the plaintiff clashed with Briggs does not demonstrate discrimination on the part of OPM. The plaintiff presumes, without support, that any two supervisors must approach or treat or interact with an employee in precisely the same manner, and that Briggs' "hands-on" style is evidence of discrimination.

## 2. Termination

The terms of the plaintiff's appointment in the excepted service called for termination if her performance were not satisfactory. *See* Def.'s Mem., Ex. 3. OPM determined just that – the plaintiff not only failed to meet quality standards, but also committed misconduct. *See id*., Ex. 13. As discussed above, the plaintiff's FY 2008 performance appraisal and the Quality Management Group's independent review of the plaintiff's work supported the conclusion that the plaintiff's overall performance was unacceptable. Briggs attested to the plaintiff's verbal abuse by telephone and in person, and her rude and unprofessional emails. *See* Second Briggs Aff. at 2.

In response, the plaintiff relies on the same arguments she presented with respect to the denial of a within grade increase and a promotion. *See* Pl.'s Opp'n at 9-11. Again, the plaintiff fails to demonstrate any connection between her termination to her race, color, or age, or shows that OPM terminated her in retaliation for having engaged in protected EEO activity. The plaintiff proffers no evidence upon which a reasonable jury might find that OPM's proffered legitimate nondiscriminatory reasons for terminating her employment are not the actual reasons,

and that OPM intentionally discriminated against the plaintiff because of her race, color, or age, or for having filed EEO charges against OPM.

**B. Other Adverse Employment Actions**.

Aside from OPM's decisions to deny a within grade increase, deny a promotion, and to terminate the plaintiff, the plaintiff sets out a "laundry list of grievances" in the "Statement of Facts" section of the complaint: "[r]equiring daily work reports, in-person meetings, check-rides, hold report periods, assigning inconsistent amounts of work, and failing to provide training or performance statistics." Def.'s Mem. at 18. The defendant argues that none of these actions "establish[es] a *prima facie* case of disparate treatment discrimination on the bases of race, color and/or age because there is no record evidence showing that the actions were caused by [the plaintiff's] membership in a protected class, or that [she] was treated less favorably than similarly situated employees outside of her protected class." *Id.*

With respect to a retaliation claim, the plaintiff must show that she "engaged in protected activity, as a consequence of which her employer took a materially adverse action against her." *Weber v. Battista*, 494 F.3d 179, 184 (D.C. Cir. 2007) (citations omitted). A "materially adverse action" is one which "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). The defendant argues that none of the "laundry list" items is a materially adverse action. Def.'s Mem. at 18.

Lastly, insofar as the plaintiff "may attempt to argue that . . . Briggs retaliated against her for her EEO activity by complaining about her to other SACs and telling them about [her] EEOC complaint, and/or that such conduct demonstrates pretext," the defendant noted that no materially adverse employment action resulted. Def.'s Mem. at 19. At most, they posit, Briggs behaved unprofessionally by disclosing information about her interactions with the plaintiff, and the only

potential impact on the plaintiff would have arisen is the infrequent circumstance that she would approach another SAC for guidance or assistance when Briggs was unavailable. *See id.*

The plaintiff has not responded to these arguments, all of which the Court finds persuasive. Even of these "laundry list" items were discriminatory, not one amounts to a materially adverse action.

### C. Hostile Work Environment

A hostile work environment is a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)); *see Baloch*, 550 F.3d at 1201. Determining whether a hostile work environment exists requires "looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faraghar v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23) (internal quotation marks omitted). Critically, the plaintiff must also show "some linkage between the hostile behavior and the plaintiff's membership in a protected class." *Na'im v. Clinton*, 626 F. Supp. 2d 63, 74 (D.D.C. 2009); *see Jenkins v. District of Columbia*, 281 F. Supp. 3d 77, 88 (D.D.C. 2017).

From the "Statement of Facts" section of the complaint, the defendant surmises that the plaintiff might base a hostile work environment claim on Briggs' demeaning emails, disrespectful behavior and unprofessional conduct, placement on hold report status, mandatory meetings with Briggs, lack of training, and inconsistent or excessive work assignments. Def.'s Mem. at 20. The plaintiff points to Briggs' actions "to undermine and demean" her, initially by sending emails designed "to single her out and discredit her in front of her colleagues." Pl.'s

Opp'n at 13. She also spoke to the plaintiff "in a nasty tone," or "in a raised voice" or a "harassing tone." *Id.* Briggs "badgered" her by repeating the same questions, *id.*, and "spoke negatively" about her "to other SACs," *id.* at 14. Based on these circumstances, the plaintiff claims to have "satisfied her burden of demonstrating . . . a hostile work environment." *Id.* at 13. This record simply does not support the conclusion urged by the plaintiff, given her failure to link any of Briggs' actions, or the actions of any other supervisor, to the plaintiff's race, color or age, or to demonstrate a retaliatory animus on the defendant's part. Without any apparent connection to the plaintiff's protected class or protected activity, there is no basis from which a reasonable jury could conclude that OPM created a hostile work environment. *See Baloch*, 550 F.2d at 1201 (noting that "none of the comments or actions directed at Baloch expressly focused on his race, religion, age, or disability"); *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) (observing that incidents bearing no relation to the plaintiff's protected class cannot be used to support a hostile work environment claim), *aff'd*, 222 Fed. App'x 5 (D.C. Cir. 2007) (per curiam), *cert. denied*, 552 U.S. 1243 (2008).

Without question, the plaintiff and Briggs had a contentious relationship. Regardless of how unpleasant for the plaintiff what she perceived as rudeness, raised voices and criticism may have been, these circumstances do not create a hostile work environment. *See, e.g., Johnson v. Perez*, 66 F. Supp. 3d 30, 44 (D.D.C. 2014) ("[E]ven when viewing the facts in the light most favorable to Johnson and taking as true his experiences of being 'yelled at,' 'scrutinized,' and called 'stupid' behind his back, the Court cannot find that these experiences, although obviously unpleasant and highly questionable, constitute the type of hostile and abusive workplace environment that gives rise to a claim under Title VII."), *aff'd*, 15-5034, 2015 WL 5210265 (D.C. Cir. July 1, 2015) (per curiam); *Dudley v. Wash. Metro. Area Transit Auth.*, 924 F. Supp.

2d 141, 171 (D.D.C. 2013) (finding that "simply having a rude, harsh, or unfair boss is not enough for a hostile work environment claim"); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) ("[T]he removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context.").  This plaintiff is not the first to have clashed with a supervisor, and she simply has not shown intentional discrimination so severe and pervasive as to alter the conditions of her employment.  *See Franklin v. Potter*, 600 F. Supp. 2d 38, 77 (D.D.C. 2009) ("[T]he fact that an employee and his immediate supervisor repeatedly 'butted heads,' that the supervisor 'frequently yelled at him during discussions about his work,' and that the supervisor 'threatened him' with job-related consequences for his refusals to meet workplace expectations does not demonstrate a hostile work environment pervaded by discrimination or retaliation.").

## IV. CONCLUSION

The Court concludes that OPM has demonstrated legitimate nondiscriminatory reasons for three adverse employment determinations: denying the plaintiff a within grade increase, denying the plaintiff a promotion, and terminating the plaintiff's employment.  In addition, the Court concludes that OPM has not taken any other materially adverse employment action to support a discrimination or retaliation claim.  Lastly, the Court concludes that OPM has not subjected the plaintiff to a hostile work environment.  Accordingly, the defendant's motion for summary judgment is granted.  An Order is issued separately.


DATE: March 30, 2018                        /s/ *Beryl A. Howell*

                                            BERYL A. HOWELL
                                            Chief Judge